UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RESERVE MEDIA, INC., | ) | Case No. CV 15-05072 DDP (AGRx) |
| | ) | |
| Plaintiff, | ) | **ORDER RE: PLAINTIFF'S THIRD** |
| | ) | **MOTION FOR PARTIAL SUMMARY** |
| v. | ) | **JUDGMENT** |
| | ) | |
| EFFICIENT FRONTIERS, INC., et al., | ) | [Dkt. 305] |
| | ) | |
| Defendants. | ) | |

Presently before the court is Plaintiff and Counter-Defendant Reserve Media, Inc.'s ("Reserve") Third Motion for Partial Summary Judgment. After considering the parties' submissions and hearing oral argument, the court adopts the following Order.

**I. BACKGROUND**

The court assumes the parties' familiarity with the facts, which have been set forth more fully in the court's prior partial summary judgment orders. (Dkts. 235, 296.) In brief, Efficient Frontiers, Inc. ("EFI") is a company that offers software products to companies in the hospitality industry. (First Amended Counterclaim ("FAC") ¶¶ 4, 15-17.) EFI's products assist with catering and event-management, restaurant table

management, and dining reservations. (FAC ¶¶ 17-19.) Reserve Media, Inc. ("Reserve") is a startup company focusing on restaurant technology, which was founded in 2014. (Dkt. 296 at 2.) According to the founders, the company aims to compete with consumer-facing software companies that facilitate restaurant reservations. (*Id.*) The company offers products and services using the mark "Reserve."

This suit arises out of a trademark dispute between EFI and Reserve. After learning about Reserve's business, EFI sent Reserve a cease-and-desist letter for attempting to use a mark that infringes on EFI's marks "Reserve Interactive and its variations." (*Id.*) The parties attempted to negotiate their trademark dispute but Reserve ultimately filed for declaratory relief seeking a determination that its use of the "Reserve" mark does not infringe on EFI's trademark rights. (Complaint ¶ 14.) EFI responded with a counterclaim asserting federal and state causes of action for trademark infringement and unfair competition. (FAC ¶¶ 34-60.)

At issue in this litigation were ten EFI trademarks. Prior summary judgment motions addressed whether there were triable issues as to eight of the ten trademarks. (*See* Dkts. 235, 296.) In prior Orders, the court concluded that six of EFI's marks were not valid and protectable as a matter of law because they were descriptive and lacked secondary meaning. (*Id.*) The court also concluded that there was no triable question as to Reserve's willful infringement for any mark. The two trademarks that were not addressed in either Order were EFI's RESERVE Q marks. Given the basis for the prior summary judgment orders, the court determined that the best use of judicial resources would be to direct the parties to file summary judgment briefs regarding these remaining marks so as to ensure that there were triable issues warranting a jury trial. *See Portsmouth Square Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985) (noting that, even as late as the final pretrial conference, the district court has authority to sua sponte enter summary judgment if no material facts are at dispute in order to "conserves scarce judicial resource"). In order to ensure the parties had adequate notice and a "full and fair opportunity to ventilate the issues," s*ee Norse v. City of Santa Cruz*, 629 F.3d 966, 972–73

2

(9th Cir. 2010) (citing *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 990 (9th Cir. 2008)), the court set a briefing schedule for a third successive summary judgment motion.

At issue in this motion are EFI's two RESERVE Q marks. The first RESERVE Q mark was registered in October 2012 and is a standard word mark for "computer software for database management used in the hospitality industry." (Carter Decl., Ex. 1.) The second mark was registered in March 2013 and is a standard service mark for "design, development, implementation and maintenance of software for others in the hospitality industry." (*Id.*, Ex. 2.) These marks are used in connection with EFI's "ReServe Q" online hospitality management software. (Carter Decl. ¶ 5.) ReServe Q is a web-based software application that allows business in the hospitality industry to "leverage reservations, waitlists, and marketing opportunities." (Id. ¶ 14, Ex. 11.) The question at issue in the instant motion is whether the RESERVE Q marks are valid and enforceable as a matter of law and, if so, whether there is a triable issue of fact as to likelihood of confusion under the *Sleekcraft* analysis. Finally, as in the prior motions for partial summary judgment, there is a question of whether Reserve is entitled to summary judgment on EFI's damages theories for the RESERVE Q marks.

**II. LEGAL STANDARD**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate

3

that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Id*.

**III. DISCUSSION**

"To prevail on [a] trademark infringement claim," a party must show that "(1) it has a valid, protectable trademark, and (2) that [the other party's] use of the mark is likely to cause confusion." *Applied Info. Sciences Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007). The court addresses each of these issues in turn.

    **A.**    **Distinctiveness of RESERVE Q Marks**

This is the court's third inquiry into whether EFI's RESERVE marks are distinctive, and thus protectable, as a matter of law. *See Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010). In each of the prior instances, the operative question was

whether the marks were descriptive, and thus required a showing of secondary meaning, *Zobmondo*, 602 F.3d at 1113, or suggestive, and thus automatically entitled to federal trademark protection as "inherently distinctive," i*d.*; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). The question is no different with regards to EFI's final two marks at issue: the RESERVE Q marks.

As a general matter, suggestive marks require "a consumer [to] use imagination or any type of multistage reasoning to understand the mark's significance." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir. 1998). By contrast, descriptive marks "define qualities or characteristics of a product in a straightforward way." *Id*. "Whether a mark suggests or describes the goods or services of the trademark holder depends, of course, upon what those goods or services are. We therefore adjudge a mark's strength by reference to the goods or services that it identifies . . . ." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002) (internal quotations and citations omitted).

The two tests invoked in the Ninth Circuit to differentiate between suggestive and descriptive marks are the "imagination test" and the "competitors' needs test." *Zobmondo*, 602 F.3d at 1115. The former asks whether "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced," *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007) (quotation marks omitted), and the latter "focuses on the extent to which a mark is actually needed by competitors to identify their goods or services," *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987). These two tests are complementary rather than independent inquiries as "the more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services." *Zobmondo*, 602 F.3d at 1117 (quotations and citations omitted).

Reserve argues that the RESERVE Q marks are descriptive when used in connection with "a web-based software application that enables customers to manage

5

reservations, call-aheads, and waitlists." (Dkt. 276 [Carter Decl.] ¶ 15.) In support, Reserve notes that EFI selected the letter "Q" as "a play on the word [queue] – a line at a restaurant." (Ex. E [Remmel Depo.], p. 214:6-12.) Given that a queue ordinarily refers to a line of people waiting for something, Reserve contends that a literal and unimaginative consumer would be able to understand that RESERVE Q refers to a service for managing reservations. (Opp'n 4.)

EFI responds that the RESERVE Q marks are, at a minimum, suggestive. First, EFI notes that a consumer might understand "Q" to mean just the letter, the word "cue," the idea of "questions," among other possibilities. (Opp'n 4-5.) Although Q may have been selected because it evokes the idea of a "queue," it takes at least some imagination to connect the two concepts. EFI further contends that, even if Q immediately signified "queue," that does not accurately describe the product in question. EFI's software does not enable someone to "reserve a queue" or a spot in a queue. Rather, EFI argues that the software in question deals with table reservations—which often can be done in advance and do not require patrons to stand in queue—and also enables businesses to leverage reservations for marketing purposes. (Carter Decl. 5.)

At bottom, EFI's various "reserve" marks are fundamentally weak. As the court has explained in prior Orders, this family of marks invokes the common verb "reserve" in a business context where there is almost no other substitute for the service being offered. (*See* Dkt. 235 at 9.) Admittedly, EFI did not use the term in isolation to describe its products. However, the majority of the marks at issue appended the word "reserve" with equally common words such as "it" or "cloud" or "interactive." In all these instances, "an entirely unimaginative, literal-minded person would understand the significance of the reference." *Entrepreneur Media*, 279 F.3d at 1142. Thus, on prior occasions, the court found that allowing EFI a monopoly over "reserve," and closely associated phrases, would inhibit competitors across a range of businesses dealing with reservations from invoking a common word to describe their products and services.

6

Even beyond this specific business context, the court notes that "reserve" is one of a few words so essential to economic activity across domains that courts should be particularly cautious about allowing any single private actor to monopolize the use of the term. The word reserve means "[t]o set (a thing) apart for some purpose." 13 Oxford English Dictionary (OED) (2d ed. 1989) 701. Along with concepts such as buying, selling, renting, and consuming, "reserving" is a basic commercial activity that nearly all individuals and business must engage in at times. Given that one of the central aims of trademark law is to promote fair and productive economic competition, *see New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 305 (9th Cir. 1992), any use that seeks to own core words such as "reserve" must be scrutinized closely.

Bearing these concerns in mind, the court notes that there is some argument for extending its prior holdings about other descriptive "reserve marks" to the RESERVE Q marks. Nonetheless, at this juncture, the court determines that these final two marks fall slightly on the other side of descriptive-suggestive divide. While Reserve is correct that the phrase "Reserve Queue" is conceptually related to the services EFI offers, it does require some level of "multistage reasoning" to understand the marks' significance. Specifically, a consumer must first understand that the letter "Q," even when placed in the appropriate context of the reservation management business, specifically means a literal queue rather than indicating just the letter or a question. Then, the consumer must associate "reserve queue" with a table reservation, waitlist management, and marketing platform rather than, say, a line waiting service. *See* Jacob Bernstein, *A Professional Line Sitter Throws His Wait Around*, New York Times, Oct. 3, 2014, at ST8 (noting the emergence of professional line-sitters). Thus, even appropriately defined, the marks "subtly connote something about the products," *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 941, 349 (9th Cir. 1979) (describing suggestive marks) rather than defining the product in a straightforward manner.

**B. Likelihood of Confusion**

"The test for likelihood of confusion is whether a reasonably prudent consumer in the market place is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998) (internal quotations omitted). Relevant factors include the strength of the mark, proximity of the goods, similarity of the marks, evidence of actual confusion, marketing channels used, degree of care likely to be exercised by consumers, defendant's intent, and likelihood of expansion of product lines. *Sleekcraft*, 599 F.2d at 348-49. It is unnecessary to meet every factor, because the likelihood of confusion test is "fluid." *Surfvivor Media, Inc. v. Survivor Prods*, 406 F.3d 625, 631 (9th Cir. 2005).

1. Strength of the Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999). In order to determine the strength of a particular mark, courts take into account both the conceptual strength and the commercial strength of a mark. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

"A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011). As a general matter, suggestive marks are protectable, but it is presumed that they are conceptually weak. *Brookfield Communications*, 174 F.3d at 1058 (noting that "[w]e have recognized that, unlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak"). As discussed above, the Court finds that Plaintiff's marks are suggestive, and, thus, are presumed weak.

The second step of the inquiry is to determine the strength of the mark in the marketplace. *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009). Two undisputed facts suggest that the RESERVE Q marks are commercially weak

8

as a matter of law. First, between 2011 and 2015, EFI has generated less than $15,000 in sales of the Reserve Q product. (Dkt. 276-1. [Sealed Exs. 72-76].) During the same period, EFI's total sales were between $3 million and $4 million dollars annually. (*Id.*) Both compared to the size of the market and to EFI's other products, Reserve Q sales were marginal. Second, as discussed in the prior orders, EFI's RESERVE marks, including RESERVE Q, are hemmed in all sides by competitors who must also use the term reserve. (Dkt. 235 at 11; Dkt. 296 at 16.) "When similar marks permeate the marketplace, the strength of the mark decreases. In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd." *One Indus.*, 578 F.3d at 1164 (internal quotation marks omitted). EFI's primary rejoinder on the strength of the mark is that it intends to "revamp its product offerings" under the RESERVE Q marks. While future plans to improve the strength of the mark may change the analysis for purposes of a future infringement claim, it cannot be used to buttress the instant claim.

2. Proximity of the Goods

"Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n. 10 (citation and internal quotation marks omitted). Both parties use marks in connection with a software program for accepting and managing dining reservations. Although EFI's product may have additional capabilities, both parties acknowledge that goods in question are related. Nonetheless, Reserve argues that the court should follow the Ninth Circuit's statement in *Entrepreneur Media* that courts should "apply a sliding scale approach as to the weight that relatedness will carry dependent upon the strength of the trademark holder's mark." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002). The rationale for this approach is that, "[w]hile the public and the trademark owner have an interest in preventing consumer confusion, there is also a broad societal interest in preserving common, useful words for the public domain." *Id.* In *Entrepreneur Media*, the court was addressing a descriptive mark but that logic should

9

extend to weak suggestive marks such as RESERVE Q. Although some imagination is required to connect the mark "RESERVE Q" with the products in question, competitors in the reservation management industry should not be discouraged from using the term "reserve." *Id.* ("We do not want to prevent the commercial use of descriptive words to name products, as straightforward names are often the most useful identifiers."). Accordingly, the court recognizes that the parties' goods are related but concludes that the factor does not weigh heavily in favor of likely confusion.

### 3. Similarity of the Marks

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. As to sight, the marks "must be considered in their entirety and as they appear in the marketplace." *Brookfield Communications*, 174 F.3d at 1054. EFI's RESERVE Q marks and Reserve's RESERVE mark are visually distinct. Although both marks are comprised of upper case letters, they are depicted in different fonts. Further, EFI's marks are made up of two colors (red and purple) while Reserve's mark is black. Some of the letters in EFI's marks are different sizes while Reserve's mark is a uniform size. EFI's marks also have an additional design element (there are three waves or arcs emanating from the "Q") while Reserve's mark is unadorned. Turning to sound, the marks are sonically distinct. EFI's marks are made up of two words while Reserve's mark is only one word. Furthermore, Reserve 's mark is only two syllables while EFI's is three. *See Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1163 (N.D. Cal. 2011) (nothing differences in the number of syllables in each mark). Finally, on the issue of meaning, the parties recognize that a consumer will understand both uses of the word "reserve" to mean the same thing. However, the additional letter "Q," which is also intended to evoke the idea of queue, suggests the two words also have different meaning. *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1052 (C.D. Cal. 2013) ("Multiple courts have found that the presence of a common word does not render two marks similar where additional words make the marks distinctive.") Taken together, this factor weighs against a finding of likely confusion.

### 4. Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. However, due to "the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive." *Id.*; *see Brookfield Communications*, 174 F.3d at 1050 ("[D]ifficulties in gathering evidence of actual confusion make its absence generally unnoteworthy.").

In the instant case, EFI relies on declarations submitted by users of EFI's other RESERVE products to substantiate the claim that there is at least some evidence of actual confusion. (Opp'n 15-16.) As Reserve notes, however, these alleged instances of confusion pertain to other EFI marks—specifically, RESERVE INTERACTIVE and RESERVE CLOUD—and do not address the instant mark. EFI also relies on an expert survey to show consumer confusion between the RESERVE Q and RESERVE marks. (Opp'n 16.) Reserve raises a number of objections to relying on this survey, including the fact that EFI's expert did not timely disclose the survey. (*See* Dkt. 81; Mot. 14-15.) Without resolving whether that issue makes the survey data inadmissible, the court notes a separate deficiency identified by Reserve, which is that expert survey did not show respondents the marks as they appear in the marketplace and instead asked: "How different or similar do you think are the names Reserve versus Reserve Q?" and "How likely do you think the names Reserve and Reserve Q are associated with products or services offered by the same company?" (Dkt. 321-7 [Ex. 28 to Okadigbo Decl.], at 9, 24-25, 39, 53.) These questions, without any indication of what the marks actually looked like, cannot be used to support EFI's contention that there was evidence of actual confusion. Given that the lack of actual confusion should not be given substantial weight, the court finds that this factor is neutral in the overall likelihood of confusion analysis.

### 5. Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1083 (9th Cir. 2005). In evaluating this factor, courts consider the locations of potential buyers, the price ranges of the goods or

services, and the types of advertising used. *See Sleekcraft*, 599 F.2d at 353. Reserve contends that this factor weighs against a finding of likelihood confusion because EFI markets its products solely to business while Reserve markets to both consumers and businesses. (Mot. 11.) EFI responds that Reserve's multipronged marketing approach should not alter the conclusion that both parties rely on at least some of the same marketing channels. Instead, according to EFI, the operative facts are that both parties market to businesses and that they do so, at least in part, through in-person contacts. (Opp'n 17-18 (citing Okadigbo Decl. Ex. 12 [Hong Depo. Trs.] at 213-214; Carter Decl. ¶ 22.) While the parties employ different marketing channels, the evidence does suggest that at time their marketing efforts may overlap. Accordingly, the court finds that this factor weighs somewhat in favor of a likelihood of confusion.

      6.   Degree of Care

"Low consumer care . . . increases the likelihood of confusion." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). Courts should take into account "the type of good or service offered and the degree of care one would expect from the average buyer exercising ordinary caution." *See La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 877 (9th Cir. 2014) (internal quotation marks and citation omitted). "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely." *Sleekcraft*, 599 F.2d at 353. "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." *Id*.

The evidence suggests that business consumers selecting a reservation software platform are likely to exercise a comparatively higher degree of care. As Reserve notes, the average EFI customer pays $3,000 per year and the average Reserve customer pays $1200 per year. (Houck Decl., Ex. W [Carter Depo.] at 29:4-16, 64:5-19, 129:13-16.) While there is no evidence to contextualize how large an expenditure this is from the perspective of the average business owner buying these products, it does suggest that the consumers are sophisticated decision-makers and professionals who can be expected to

12

exercise a greater degree of care. While EFI notes that this merely an assumption about how business owners think, EFI's own corporate representative acknowledged that decision to purchase EFI products was "a big decision." (Carter Depo. 159:11-163:2.) While not necessarily dispositive, it does suggest that this factor weighs against a finding of likelihood of confusion.

### 7. Defendant's Intent

The court has previously concluded that there is no evidence of willful infringement. (Dkt. 296 at 21:22-23.) Accordingly, this factor weighs against a finding of likelihood of confusion.

### 8. Likelihood of Expansion of Product Lines

When there is "a strong possibility that either party may expand his business to compete with the other," this factor weighs in favor of finding "that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (internal quotation marks omitted). "When goods are closely related, any expansion is likely to result in direct competition." *Id*. The Court must determine whether the allegedly infringing mark is "hindering the plaintiff's expansion plans." *Survivor Media*, 406 F.3d at 634. A plaintiff must offer proof beyond mere speculation or generalized expansion goals. *See id*. (holding that mere "expressed interest in"—rather than "concrete evidence" of—expansion tilted factor in favor of defendant). Reserve contends that there is no evidence that EFI plans to expand its Reserve Q offerings to compete with Reserve. EFI does not dispute this claim but instead focuses on the principle that "[w]here two companies are direct competitors, this factor is unimportant." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011). EFI contends that, because the two parties are competitors, this factor should be ignored. Thus, the court finds that, at a minimum, this factor is neutral and, if anything, it weighs slightly in favor of Reserve.

### 9. Overall Likelihood of Confusion Analysis

Six of the eight *Sleekcraft* factors in this case are either neutral or weigh against a finding of likely confusion. Specifically, the evidence of actual confusion and the

likelihood of expansion of product lines are neutral. The strength of the marks, the similarity of the marks, the degree of care exercised by the relevant consumer, and the defendant's intent all weigh against likely confusion. There is some evidence of overlap in marketing channels and an acknowledgement that the goods are proximate. While the former suggests some possibility of confusion, the latter will not be given much weight in this case where the primary word in the mark is a common term that must be invoked by all competitors in this field of business. Given this balance of factors, the court finds that EFI has not met its burden to show triable issue as to likelihood of confusion between the RESERVE and RESERVE Q marks.

### C. Damages

Having concluded the summary judgment should be entered in Reserve's favor on the question of liability, the court will not consider the arguments regarding damages.

### D. Declaratory Relief

Reserve initiated this action seeking a declaration that its "use of the term RESERVE does not infringe on any valid trademark right of Defendants or otherwise violate Defendants' rights . . . ." (*See* Compl.) In the first partial summary judgment Order, the court held that EFI's RESERVE INTERACTIVE word mark was not valid and protectable, and thus could not provide the basis for an infringement action against Reserve. (Dkt. 235 at 10.) In the second Order, the court came to the same conclusion regarding EFI's RESERVE IT, RESERVE IT 2.0, RESERVE GATEWAY, RESERVE UNIVERSITY, and RESERVE CLOUD marks. (Dkt. 296 at 16.) The court also held in the second partial summary judgment Order that there was no infringement as a matter of law as to EFI's incontestable RESERVE INTERACTIVE design mark and RESERVE ANYWHERE word mark (*Id.* at 18-19.) Finally, in this Order, the court concluded that Reserve was entitled to summary judgment on infringement claims pertaining to the RESERVE Q marks after a *Sleekcraft* analysis. In light of these determinations—that EFI cannot show Reserve infringed upon any of EFI's asserted trademarks—the court finds that Reserve is entitled to declaratory relief as a matter of law.

14

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Reserve's Third Motion for Partial Summary Judgment that there is no triable issue of fact as to the infringement of the RESERVE Q marks. Further, having granted summary judgment in favor of Reserve on all of EFI's counterclaims for infringement, the court finds that judgment is also appropriate on Reserve's declaratory claim for non-infringement. In light of this order, all pending motions are hereby vacated.

**IT IS SO ORDERED.**

Dated: April 14, 2017

_____
DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE